| | | |
|---|---|---|
| JOHNNY OSCAR RILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:15-cv-00069-JAR |
| | ) | |
| AK LOGISTICS, INC., | ) | |
| SARVAR YULDASHEV, and | ) | |
| C.H. ROBINSON COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant C.H. Robinson's Motion for Summary Judgment (Doc. 35), Motion to Exclude the Opinion of Thomas Corsi, Ph.D. (Doc. 40), Motion to Exclude the Opinions of William Hampton (Doc. 42), and Motion to Dismiss Defendants A.K. Logistics, Inc. and Sarvar Yuldashev Pursuant to Rules 12(b)(1) and 21 or, in the Alternative, Motion in Limine and for other Relief at Trial (Doc. 86). Also before the Court is Plaintiff Johnny Oscar Riley's Motion to Exclude the Opinion of Thomas A. Lambert (Doc. 85). The motions are fully briefed and ready for disposition. For the following reasons, the Court will grant in part and deny in part C.H. Robinson's Motion for Summary Judgment, Motion to Exclude the Opinion of Thomas Corsi, and Motion to Exclude the Opinions of William Hampton; grant in part and deny C.H. Robinson's Motion to Dismiss its Co-Defendants; and grant Riley's Motion to Exclude the Opinion of Thomas Lambert.

**<u>Background</u>**

On January 16, 2015, Plaintiff initiated this action in the Circuit Court for the County of New Madrid, Missouri; A.K. Logistics thereafter removed the matter to this Court (Docs. 1, 1.3). In his complaint, as amended, Riley alleges the following facts. On October 11, 2014, a tractor-trailer operated by Defendant Sarvar Yuldashev rear-ended a motorcycle operated by Riley on Interstate Highway 55 in New Madrid County, Missouri ("the collision") (Doc. 51 at 1-2). Riley sustained serious physical injuries in the collision (<u>Id.</u> at 2-3). According to Riley, Yuldashev was employed by Defendant A.K. Logistics at the time of the collision, and the collision and the injuries he suffered therein were caused by Yuldashev's negligence and carelessness (<u>Id.</u> at 1-4).

Riley asserts two claims for relief (<u>Id.</u> at 1-6). In Count I, he seeks compensatory damages from Yuldashev and A.K. Logistics, alleging that Yuldashev negligently and carelessly caused the collision and that he did so while acting within the course and scope of his employment with A.K. Logistics (<u>Id.</u> at 1-3). In Count II, Riley seeks damages from C.H. Robinson (<u>Id.</u> at 3-6). Specifically, he alleges that, at the time of the collision, Yuldashev was delivering a load ("the load") for third-party non-defendants, pursuant to arrangements C.H. Robinson brokered (<u>Id.</u> at 4). Riley seeks to recover from C.H. Robinson under three potential theories: (1) that C.H. Robinson negligently hired A.K. Logistics as an independent contractor; (2) that C.H. Robinson is vicariously liable for Yuldashev's negligence because A.K. Logistics was its agent; and (3) that C.H. Robinson and A.K. Logistics are jointly liable for his injuries because they were acting in a joint venture in delivering the load (<u>Id.</u> at 3-6).

**<u>Discussion</u>**

I.  <u>C.H. Robinson's Motion for Summary Judgment</u>

C.H. Robinson now moves for summary judgment, arguing that it was not negligent in hiring A.K. Logistics to carry the load, that it was not in an agency relationship with A.K. Logistics or Yuldashev at the time of the collision, and that it also was not in a joint venture with A.K Logistics (Docs. 35-36, 64, 88). Riley opposes the motion, asserting that genuine disputes of material fact remain as to each of his theories of recovery (Doc. 47).

A.  Summary Judgment Standard

The Court may grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Peterson v. Kopp</u>, 754 F.3d 594, 598 (8th Cir. 2014). A moving party bears the burden of informing the Court of the basis of its motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. <u>Celotex</u>, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)).

B.  Negligent Hiring of an Independent Contractor

C.H. Robinson argues that it is entitled to judgment as a matter of law to the extent Riley alleges it negligently hired A.K. Logistics as an independent contractor (Docs. 36 at 2-10; 64 at 2-12). Riley disagrees, arguing that C.H. Robinson negligently failed to adequately investigate publicly available information relating to A.K. Logistics' safety history (Doc. 47 at 2-18).

1. Legal Standard

An employer is liable for its independent contractor's negligent conduct if the employer fails to exercise reasonable care in hiring a competent independent contractor. LeBlanc v. Research Belton Hosp., 278 S.W.3d 201, 205-06 (Mo. Ct. App. 2008); Lonero v. Dillick, 208 S.W.3d 323, 329 (Mo. Ct. App. 2006) (citing Sullivan v. St. Louis Station Assocs., 770 S.W.2d 352, 356 (Mo. Ct. App. 1989)). An employer has a duty to hire a "skilled and competent contractor." Lonero, 208 S.W.3d at 329 (citing Sullivan, 770 S.W.2d at 356). A competent and careful contractor has "the knowledge, skill, experience, and available equipment which a reasonable person would realize that a contractor must have in order to do the work which he or she is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary." Lee v. Pulitzer Pub. Co., 81 S.W.3d 625, 635 (Mo. Ct. App. 2002) (citing Restatement (Second) of Torts § 411 (1965)).

To establish a claim for negligent hiring of an independent contractor, Riley must demonstrate (1) that C.H. Robinson knew or should have known that A.K. Logistics was incompetent to carry the load, and (2) that C.H. Robinson's negligence in hiring A.K. Logistics proximately caused his injuries. See Gibson v. Brewer, 952 S.W.2d 239, 246 (Mo. 1997); Reed v. Kelly, 37 S.W.3d 274, 277 (Mo. Ct. App. 2000) (citing Gaines v. Monsanto Co., 655 S.W.2d 568, 570 (Mo. Ct. App. 1983)). "It is well recognized that a contractor's negligence in

4

conducting the work it was hired to do creates no presumption that the employer was negligent in selecting the contractor. One incident of poor judgment does not prove incompetence." Sullivan, 770 S.W.2d at 356 (internal citation omitted). Moreover, an employer is not liable for the negligence of its independent contractor, notwithstanding any lack of care it took in selecting the contractor, if the contractor hired was in fact competent. Lonero, 208 S.W.3d at 329 (citing Sullivan, 770 S.W.2d at 356).

### 2. C.H. Robinson's Arguments

C.H. Robinson asserts that A.K. Logistics and Yuldashev were competent; that to the extent they were not competent, it did not and could not have reasonably known of their incompetence; and that Riley cannot show that their alleged incompetence proximately caused the collision or his injuries (Doc. 36 at 2-10). As to Yuldashev's competence, C.H. Robinson notes that he had a valid commercial driver's license, that there is no evidence his license had ever been suspended or revoked, that he passed a road test before he was permitted to drive for A.K. Logistics, that he had been driving for A.K. Logistics for a period of two to three years before the collision, that he had not been involved in any accidents previously, and that the president of A.K. Logistics believed he was reliable (Id. at 4).

C.H. Robinson argues that A.K. Logistics was qualified to carry the load because it had liability insurance, was authorized to operate as a motor carrier, and was unrated by the Federal Motor Carrier Safety Administration's ("FMCSA") motor carrier safety rating system (Id.). C.H. Robinson also notes that, between December 2008 and October 2014, A.K. Logistics carried 990 loads for C.H. Robinson customers, and did so without any indication that it was unsafe or unfit (Id. at 5). In C.H. Robinson's view, it could not have been negligent in hiring A.K. Logistics in this case, given its six-year, incident-free history with the company (Id. at 5-6).

C.H. Robinson further contends that it could not have reasonably known of Yuldashev's or A.K. Logistics' alleged incompetence (Id. at 6-8). In C.H. Robinson's view, it reasonably decided, as a matter of company policy, not to consider Behavior Analysis and Safety Improvement Categories ("BASIC scores") when hiring motor carriers, and more specifically, when it decided to hire A.K. Logistics (Id. at 6-8). BASIC scores are another FMCSA measure used to rate motor carriers, in a variety of categories, including crashes, driver fitness, hours of service and unsafe driving. Of note, BASIC scores rank individual motor carriers' safety performance against other carriers, producing a percentile score in each category based on how a carrier has performed in comparison to its peers.

C.H. Robinson claims that, at the time of the collision, the FMCSA's publicly accessible website warned that "[r]eaders should not draw conclusions about a carrier's overall safety condition simply based on the data displayed in this system. Unless a motor carrier in the SMS has received an UNSATISFACTORY safety rating pursuant to 49 C.F.R. Part 385, or has otherwise been ordered to discontinue operations by the FMCSA, it is authorized to operate on the nation's roadways." (Doc. 36 at 6-7). Moreover, C.H. Robinson emphasizes that, in December 2015, Congress passed the FAST Act[1] which stated that the percentiles reflected in individual BASIC scores "may not be used for safety fitness determinations" until an inspector general made certain certifications. Pub. L. 114-94, § 5223(b), 129 Stat. 1312, 1541 (2015). The FAST Act also removed BASIC scores from public view on the FMCSA's website. According to C.H. Robinson, Congress's enactment of the FAST Act confirms the soundness of its conclusion that BASIC scores are not reliable indicators of motor carrier safety (Id. at 7). C.H. Robinson

---

[1] The Fast Act is also known as the Fixing America's Surface Transportation Act.

argues that it reasonably decided not to consider BASIC scores when hiring motor carriers to deliver loads on behalf of its customers, given the scores' unreliability (Id. at 6-8).

C.H. Robinson also argues that Riley cannot link A.K. Logistics' and Yuldashev's alleged incompetence to the collision, i.e., that he cannot show that any of A.K. Logistics' unsafe-driving or hours-of-service violations proximately caused the collision (Id. at 9-10). C.H. Robinson does not appear to dispute that A.K. Logistics had a history of citations for traffic violations between September 2013 and October 2014; however, it argues that there is no evidence that those citations led to convictions or pleas, and that there is no evidence that any of the citations were issued to Yuldashev (Id. at 9). The president of A.K. Logistics testified at his deposition that Yuldashev did not receive any citations during that period (Id.).

### 3. Riley's Arguments

In response, Riley argues that the mere facts that A.K. Logistics had insurance, operating authority, and an "unrated" FMCSA rating are insufficient to establish that it was competent to carry the load (Doc. 47 at 3-19). In Riley's view, A.K. Logistics' status as FMSCA "unrated" provided no meaningful information regarding its safety record, as the "unrated" status meant only that it had not yet undergone the resource-intensive compliance review of its safety policies and programs required before the FMSCA assigns a meaningful rating, i.e., "satisfactory" or "unsatisfactory." Riley explains that only 16,000 of these reviews are completed each year, leaving roughly 480,000 out of more than 500,000 motor carriers with an "unrated" status (Id. at 5-6). In Riley's view, given A.K. Logistics' "unrated" status, C.H. Robinson had an obligation to also review its BASIC scores. Riley emphasizes that, had C.H. Robinson checked A.K. Logistics' BASIC scores, it would have learned it was ranked in the lowest 8% of all motor carriers for safe driving, and in the lowest 11% for hours of service, and had received a caution

flag (Id. at 7). Riley further contends that, at the time of the collision, A.K. Logistics' BASIC scores in the unsafe-driving and hours-of-service categories rendered it a "high-risk" motor carrier under the BASIC score system (Id.). He also argues that A.K. Logistics' BASIC scores reflected that its drivers had 17 unsafe driving violations, that random driver inspections had revealed 16 additional unsafe driving violations, and that its drivers had been taken out of service at twice the rate of the national average (Id. at 7 (citing Docs. 64.7 at 67; 64.11 at 6)).

Riley further argues that as early as 2013, A.K. Logistics' BASIC scores started to worsen, triggering a "non-ratable" review by the FMCSA, causing some brokers to start questioning its president about the scores, and leading other brokers to stop hiring it at all (Id. at 7-8). At his deposition, A.K. Logistics' president testified that A.K. Logistics' insurer canceled its policy five months before the collision due to its BASIC scores, that he knew A.K. Logistics' BASIC scores were "unacceptable," but that he knew he could nevertheless continue to book loads through C.H. Robinson because it did not check BASIC scores (Id. (citing Doc. 64.7 at 52, 70, 75)). In Riley's view, these facts establish that a reasonable broker would have concluded that A.K. Logistics posed an unreasonable risk to others (Id. at 9-10). Riley contends that reviewing BASIC scores before hiring a carrier is standard practice in the industry (Id. at 10). He also disagrees with C.H. Robinson's contention that BASIC scores are unreliable, argues that other brokers who rely on BASIC scores had refused to hire A.K. Logistics, and has identified two expert witnesses who are prepared to testify to the scores' reliability.[2] Riley also disputes the import of the FAST Act to this case, contending that the Act merely removed BASIC scores from public view while still allowing motor carriers and brokers to access them. He also

_____

[2] As discussed below, C.H. Robinson has moved to exclude these experts' testimony.

contends that at the time of the collision, the scores were publicly available and were widely considered reliable indicators for identification of high risk carriers (Id. at 11).

Riley also contends that he can establish a causal connection between A.K. Logistics' incompetence and the collision, i.e., that C.H. Robinson negligently hired A.K. Logistics, a carrier it should have known was incompetent, and that A.K. Logistics' incompetence proximately caused the collision (Id. at 17-19). In support of this causal connection, Riley notes that A.K. Logistics' BASIC scores placed it in the lowest 8% of carriers in the unsafe driving category, which is based, in part, on incidents of inattention and improper lane changes; that the Missouri Highway Patrol concluded that the collision was caused by Yuldashev's improper lane usage and failure to maintain a safe distance; and that an accident reconstruction expert, William Hampton, has opined that the collision was caused by Yuldashev's unsafe driving, i.e., that he made an improper lane change and was following Riley too closely (Id. at 18-19). In Riley's view, there remains a genuine dispute of fact as to whether there was a causal connection between C.H. Robinson's negligence in hiring A.K. Logistics and the collision (Id. at 19).

In reply, C.H. Robinson reiterates its arguments in favor of summary judgment on Riley's negligent-hiring claim (Doc. 64). Moreover, it disputes Riley's contention that A.K. Logistics' insurance policy was cancelled because of its deteriorating BASIC scores, insisting that the policy was cancelled because A.K. Logistics had increased the size of its fleet beyond the policy limit (Id. at 7 (citing Doc. 64.1)). It also argues that A.K. Logistics' poor BASIC scores did not mean it was incompetent to carry the load, as the scores themselves are unreliable in predicting the risk that any individual carrier will be involved in a crash. It further emphasizes that it had not been given an "unsatisfactory" rating and was still authorized by FMCSA to transport freight (Id. at 4). Finally, C.H. Robinson contends that Riley has not established a causal connection

between the BASIC scores and the collision because there is no evidence showing that Yuldashev's poor driving contributed to the BASIC scores or that he was an incompetent driver (Id. at 10-11).

        4. Analysis

The Court concludes that there remain genuine issues of material fact as to whether C.H. Robinson negligently hired A.K. Logistics to carry the load. See Peterson, 754 F.3d at 598. More specifically, the Court concludes that there remain disputes as to whether A.K. Logistics' BASIC scores were a reliable indicator of its competence or lack thereof, and whether a reasonable motor carrier would have declined to consider BASIC scores when deciding whether to hire a specific motor carrier. Also, there is a dispute as to whether, after reviewing A.K. Logistics' BASIC scores, a reasonable broker would have hired A.K. Logistics to carry the load notwithstanding its poor BASIC scores, without at least inquiring further as to the issues and incidents underlying the scores. Notably, the president of A.K. Logistics testified that some brokers had started to inquire as to its declining scores and that other brokers had refused to hire A.K. Logistics because of its BASIC scores. See Reed, 37 S.W.3d at 277 (in a negligent-hiring claim, negligence exists if a reasonably prudent person would have anticipated the danger and provided against it); cf. Sullivan, 770 S.W.2d at 356-57 (in negligent-hiring claim, plaintiff failed to establish independent contractor's incompetence because, as relevant, she did not offer evidence that the contractor had a poor safety record or poor reputation). There is some evidence that A.K. Logistics' insurance was cancelled because of its scores. Cf. Lee, 81 S.W.3d at 635 (affirming adverse grant of summary judgment on negligent-hiring claim where plaintiff adduced no evidence that independent contractor had a poor safety record or poor reputation, or that he lacked sufficient expertise and experience to act as a motor carrier). Riley has also presented an

expert witness who is prepared to testify that reliance on BASIC scores is part of the standard of care for motor carrier brokers.

The Court further concludes that there is a factual dispute on the issue of whether A.K. Logistics' alleged incompetence, as reflected in its BASIC scores, was a proximate cause of the collision. See Reed, 37 S.W.3d at 277 (the test for proximate cause is whether an injury is the "natural and probable consequence of the defendant's negligence"; in negligent-hiring claim, employee's prior misconduct may put employer on notice of employee's proclivity for similar dangerous conduct). The Court thus concludes that genuine issues of material fact remain on Riley's negligent-hiring theory and will deny C.H. Robinson's motion for summary judgment on that theory of recovery.

### C. Agency

C.H. Robinson further argues that it is entitled to summary judgment to the extent Riley seeks to hold it vicariously liable based on a purported agency relationship between it and A.K. Logistics. Specifically, it contends that it did not exercise sufficient control over A.K. Logistics to form an agency relationship (Docs. 36 at 11-20; 64 at 13-15; 88). In response, Riley asserts that C.H. Robinson's control over A.K. Logistics was sufficient to transform the relationship into that of an agency (Doc. 47 at 19-25).

#### 1. Legal Standard

An independent contractor is "a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's control with respect to his physical conduct in the performance of his undertaking." Skidmore v. Haggard, 110 S.W.2d 726, 729-30 (Mo. 1937) (adopting Restatement of Agency's definition of independent contractor). "[S]imply characterizing a party an independent contractor does not make it so. Rather, a court

must make a factual determination of independent-contractor status, and whether or not the parties believe they are creating the relationship of master and servant is only one factor out of many." Stars Invest. Grp., LLC v. AT&T Corp., No. 4:15-CV-01370-AGF, 2017 WL 747610, at *5 (E.D. Mo. Feb. 27, 2017) (internal quotations and citations omitted).

Missouri courts routinely consider the factors set forth in § 220(2) of the Restatement (Second) of Agency when determining whether a person or entity acting for another is an employee or an independent contractor for purposes of respondeat superior liability. Id. at *6 (citing Huggins v. FedExGround Package Sys., Inc., 592 F.3d 853, 860 (8th Cir. 2010)). These factors include:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employee or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer;
>
> (i) whether or not the parties believe they are creating the relation of master and servant; and
>
> (j) whether the principal is or is not in business.

Id. (citing Restatement (Second) of Agency § 220 (Am. Law Inst. 1958)); see also Dean v. Young, 396 S.W.2d 549, 553-57 (Mo. 1965). Of these factors, "the touchstone is whether the party sought to be held liable has the control or right to control the conduct of another in the performance of an act." J.M. v. Shell Oil Co., 922 S.W.2d 759, 764 (Mo. 1996) (citations omitted); Balderas v. Howe, 891 S.W.2d 871, 873-74 (Mo. Ct. App. 1995). "The determining factor is not whether [the defendant] actually exercised control over the work but whether [the defendant] had the *right* to exercise that control." Bargfrede v. Am. Income Life Ins. Co., 21 S.W.3d 157, 162 (Mo. Ct. App. 2000) (quoting Carter v. Wright, 949 S.W.2d 157, 160 (Mo. Ct. App. 1997)). The right to control "must extend to the 'means and manner of service' as distinguished from merely controlling the 'ultimate results of the service.'" Stars Invest. Grp., 2017 WL 747610, at *6 (quoting Steele v. Armour & Co., 583 F.2d 393, 398 (8th Cir. 1978)).

In Missouri, "employment status is a question of fact. In other words, a court applying Missouri law may decide employment status on summary judgment only when the material facts are undisputed *and* only one reasonable conclusion can be drawn from those facts." Id. at *5 (quoting Gray v. FedEx Ground Package Sys., Inc., 799 F.3d 995, 999 (8th Cir. 2015)).

## 2. Arguments of the Parties

C.H. Robinson contends that it did not control, nor did it have the right to control, A.K. Logistics or Yuldashev (Doc. 36 at 13-15). More specifically, C.H. Robinson argues that it was not involved in the day-to-day operations of A.K. Logistics and that it did not make any hiring or firing decisions on A.K. Logistics' behalf. Moreover, C.H. Robinson asserts that it did not tell A.K. Logistics to assign the load to Yuldashev, it did not pay Yuldashev, and there is no evidence that anyone from C.H. Robinson ever discussed the load with Yuldashev. Also, C.H. Robinson contends that it did not control its co-defendants because it did not have the right to

control the specific route Yuldashev took to deliver the load, the speed at which he drove the truck, when he accelerated or decelerated, which lane he travelled in, the means he used to change lanes, the distance he maintained between the truck and other vehicles, where he stopped to refuel, the type of fuel he used, the number of hours he drove per day, how long he stayed off-duty, or how he and A.K. Logistics would satisfy their obligations to operate the truck in a safe manner (Id. at 13-15).

C.H. Robinson emphasizes that, in August 2008, it entered into an Agreement for Motor Contract Carrier Services ("Agreement") with A.K. Logistics, whereby A.K. Logistics had "exclusive control, direction and supervision over the manner in which transportation services were to be provided, the persons engaged in providing transportation services and the equipment selected and used to provide transportation services." (Id. at 15; Doc. 47.16 at 5). The Agreement further provided that A.K. Logistics agreed "to accept responsibility for the payment of local, state and federal payroll taxes, as well as workers compensation, social security and other related payment requirements in regard to all people who provided transportation services for A.K. Logistics." (Doc. 36 at 15; Doc. 47.16 at 5). Moreover, the Agreement provided that it did "not create, nor shall it be deemed to create a partnership, joint venture, or agency relationship between [C.H.] Robinson and [A.K. Logistics]" (Doc. 47.16 at 5).

In response, Riley relies on other terms of the Agreement to support his contention that C.H. Robinson had the right to control A.K. Logistics in relation to the delivery of the load (Doc. 47 at 19-25). As noted by Riley, the Agreement also provided that "[c]ompensation shall be paid to [A.K. Logistics] solely and exclusively by [C.H.] Robinson, and not by [C.H.] Robinson's customers." (Id. at 22; Doc. 47.16 at 2). The Agreement designated C.H. Robinson as A.K. Logistics' agent for purposes of billing and collection of freight delivery charges, required A.K.

Logistics to waive its rights and claims against the shipper for payment, and prohibited it from contacting customers for payment (Doc. 47.16 at 2). The Agreement authorized C.H. Robinson to withhold all or part of any payment to satisfy claims or shortages from any other contract between it and A.K. Logistics (Id.). The terms of the Agreement also required A.K. Logistics to report to C.H. Robinson if it ever received an "unsatisfactory" FMCSA rating, had any equipment defects, or fell out of compliance with federal law (Id. at 3). The Agreement also specified what equipment A.K. Logistics could use when delivering its customers' freight (Id. at 4). Moreover, the Agreement required A.K. Logistics to make deliveries in accordance with a schedule set by C.H. Robinson, and to obtain shipping instructions—including provisions for handling, securing, and protecting the freight—from C.H. Robinson (Id. at 4-5). In the Agreement, A.K. Logistics agreed to be liable to C.H. Robinson, as opposed to its customers, for actual losses and damages to shipments, and for any delayed deliveries (Id. at 6).

Riley also points to provisions in a Contract Addendum that was executed in relation to the specific load at issue in this case (Doc. 47.17). The Addendum provided specific directions for when and where the load was to be picked up and turn-by-turn driving directions between the shipper and receiver of the load (Id. at 1, 3). It also required A.K. Logistics to provide C.H. Robinson regular tracking updates, including when Yuldashev arrived at the shipper, when he departed the shipper, once daily during delivery, when he arrived at the receiver, and when he departed the receiver (Id. at 4). Moreover, the Addendum required that any problems with the load were to be reported directly to C.H. Robinson, not the customer (Id.).

Riley also notes that C.H. Robinson's "Transportation Guide," an internal company document, indicates that it hires reliable carriers to transport its customers' products and that it "may arrange appointments for drivers, dispatch, monitor the freight's progress from start to

finish, bill the shipper, and pay the carrier." (Doc. 47.29 at 5). Finally, Riley emphasizes that several documents identify C.H. Robinson—not A.K. Logistics—as the carrier of the load; these documents include an "outbound receipt for shipment" prepared by a shipper, an invoice for a second shipper, a "packing list" for a third shipper, and a "claim form" for the damaged load (Doc. 47 at 23 (citing Docs. 47.37-47.40)). According to Riley, these documents show that C.H. Robinson's own customers considered it the motor carrier, as opposed to merely the broker, for purposes of delivering the load (Id. at 23-24).

3. Analysis

Several factors weigh in favor of finding that A.K. Logistics was an independent contractor in this case. For example, A.K. Logistics was hired to complete specific deliveries and was paid by the delivery. See Howard v. City of Kansas City, 332 S.W.3d 772, 781 (Mo. 2011) ("Independent contractors are typically hired to complete a specific task . . . [and] are paid a fixed sum on a by-the-job basis."). It also supplied its own trucks. See id.; Skidmore, 110 S.W.2d at 730; see also Gray, 799 F.3d at 1002 (workers who provide their own equipment are more likely to be independent contractors). In addition, the Agreement provided that C.H. Robinson and A.K. Logistics did not intend to create an agency relationship. See Gray, 799 F.3d at 1002 (citing Nunn v. C.C. Midwest, 151 S.W.3d 388, 402 (Mo. Ct. App. 2004) (considering a contractual designation that a worker was an independent contractor)). However, other factors weigh in favor of the existence of an agency relationship. Notably, the Contract Addendum arguably authorized C.H. Robinson to exercise significant control over A.K. Logistics and Yuldashev in their delivery of the load—it required frequent updates as to the status of the delivery, provided specific pick-up and delivery windows, and set forth turn-by-turn directions for Yuldashev to travel. See Shell Oil, 922 S.W.2d at 764 (of all the factors, the right to control is

16

the "touchstone"); <u>Stars Invest. Grp.</u>, 2017 WL 747610, at *6 (the right to control must extend to the "means and manner of service"). C.H. Robinson is in the business of brokering freight delivery services between its customers, who need freight delivered, and motor carriers, who deliver freight. Without motor carriers like A.K. Logistics, C.H. Robinson would not be in business; as such, A.K. Logistics' work is undisputedly part of the regular business of C.H. Robinson. <u>See</u> <u>Gray</u>, 799 F.3d at 1002 (citing <u>Burgess v. NaCom Cable Co.</u>, 923 S.W.2d 450, 454 (Mo. Ct. App. 1996) (finding employment where, among other things, employer "would have no *business purpose* if the work of the [employees] did not occur")).

The Court does not believe that the existence of an independent contractor relationship is the only reasonable conclusion that can be drawn from the record before it. <u>See</u> <u>Stars</u>, 2017 WL 747610, at *5. Rather, the Court believes there remains a genuine dispute on the issue of the extent to which C.H. Robinson had the right to control the details of A.K. Logistics' delivery of the load. Under these facts, the question of whether an agency relationship existed between C.H. Robinson and A.K. Logistics at the time of the collision, such that C.H. Robinson can be held vicariously liable for the injuries Riley suffered in the collision, must be determined by a jury based on the evidence presented at trial. <u>See</u> <u>Gray</u>, 799 F.3d at 1003 (reversing grant of summary judgment and finding that a genuine dispute remained as to the question of agency under Missouri law where the evidence, particularly as to the control factor, was mixed); <u>see also</u> <u>Starr</u>, 2017 WL 747610, at *6. Accordingly, the Court will deny C.H. Robinson's motion for summary judgment to the extent is seeks judgment as a matter of law on Riley's agency theory.

D.  Joint Venture

## 1. Legal Standard

Under Missouri law, a joint venture is "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." In re Genetically Modified Rice Litig., 666 F. Supp. 2d 1004, 1027 (E.D. Mo. 2009) (quoting Jeff-Cole Quarries, Inc. v. Bell, 454 S.W.2d 5, 14 (Mo. 1970)). "Elements of a joint venture include: '(1) an express or implied agreement among members of the association; (2) a common purpose to be carried out by the members; (3) a community of pecuniary interest in that purpose; and (4) each member has an equal voice or an equal right in determining the direction of the enterprise.'" Barfield v. Sho-Me Power Electric Coop., No. 11-cv-04321-NKL, 2013 WL 12145822, at *2 (W.D. Mo. Apr. 15, 2013) (quoting Ritter v. BJC Barnes Jewish Christian Health Sys., 987 S.W.2d 377, 387 (Mo. Ct. App. 1999)). The parties must also intend to create a joint venture. Id.; see also Thompson v. Tuggle, 183 S.W.3d 611, 616-17 (Mo. Ct. App. 2006) (citing Ritter, 987 S.W.2d at 387).

Missouri courts are hesitant to imply the existence of joint ventures between corporations. Barfield, 2013 WL 12145822, at *3; see also Rosenfeld v. Brooks, 895 S.W.2d 132, 135 (Mo. Ct. App. 1995) ("[I]t is possible for a corporation to exist as an arm of a joint venture. However, courts will not *imply* such agreements."). Rather, corporations generally may become members of joint ventures only by express agreement or contract. Jeff-Cole, 454 S.W.2d at 16; see also In re Genetically Modified Rice Litig., 666 F. Supp. 2d at 1027. To indicate the existence of a joint venture, an agreement between two corporations must provide for such terms as the parties "actively participating and sharing in the profits, all parties having joint and several control, and having a duty to share the losses." Barfield, 2013 WL 12145822, at *3 (quoting Ritter, 987 S.W.2d at 387)).

18

Moreover, Missouri courts are especially hesitant to imply the existence of a joint venture where an express written contract between the parties establishes a different business form. Jeff-Cole, 454 S.W.2d at 16; Rosenfeld, 895 S.W.2d at 135 ("[I]t is inappropriate for a court to imply a joint venture where, as here, it is evident that there is a different business form involved."); Binkley v. Palmer, 10 S.W.3d 166, 170-72 (Mo. Ct. App. 1999) (declining to imply a joint venture or partnership where the evidence demonstrated only the existence of a contract for services, which contained "clear disclaimers" of a joint venture or partnership relationship); cf. Thompson, 183 S.W.3d at 617 (declining to imply a joint venture where defendants were in a landlord-tenant relationship). Also, unlike agency relationships, where the parties' intent to form an agency is only one out of many factors to be considered and is a factor that is secondary to the "touchstone" control factor, the parties' intent to form a joint venture is given significant, if not controlling, weight in a joint-venture analysis. See Jeff-Cole, 454 S.W.2d at 16 ("The existence of a different type of express contract is in itself inconsistent with a claimed relationship of a joint [v]enture by implication."); see also Rosenfeld, 895 S.W.2d at 135.

## 2. Arguments of the Parties

C.H. Robinson contends that it was not in a joint venture with A.K. Logistics because the companies did not intend to form a joint venture, they did not share a common pecuniary interest in the purpose of their contractual agreement, and they did not have equal voices or rights in determining the direction of an enterprise between them (Doc. 36 at 20-25). C.H. Robinson notes that the Agreement expressly stated that A.K. Logistics was an independent contractor and explicitly disclaimed any joint-venture relationship (Id. at 21). C.H. Robinson further argues that it did not share a common pecuniary interest with A.K. Logistics because, although both businesses sought to profit from their relationship, they did not actually share profits. Instead,

A.K. Logistics received a fixed per-delivery fee for each successful delivery (Id. at 22). C.H. Robinson further contends that there was no agreement to share risks, pointing to the Agreement, which provides:

> [A.K. Logistics] shall indemnify, defend, and hold [C.H.] Robinson, its customers, consignors, and consignees, and their respective parent, subsidiaries, affiliates, employees, officers, directors, and agents harmless from and against any and all losses, harm, injuries, damages, claims, costs, expenses, and liabilities (including reasonable legal fees) arising from, or in connection with services provided by [A.K. Logistics], its employees, agents, and contractors, unless resulting directly from the negligence or willful act or omission of [C.H.] Robinson or its customers and their consignors or consignees and their respective parent, subsidiaries, affiliates, employees, officers, directors and agents.

(Id. at 22-23; Doc. 47.16 at 7).

In response, Riley argues that C.H. Robinson and A.K. Logistics' characterization of their relationship in the Agreement is not controlling. He further contends that the terms of the Agreement support a finding of a joint venture because they show that the entities shared control over the load (Doc. 47 at 25-27). Riley relies heavily on Johnson v. Pacific Intermountain Express Co., 662 S.W.2d 237 (Mo. 1983). In Johnson, a freight broker arranged for a carrier to deliver a load, collected a percentage of the shipper's payment as a fee, and paid the carrier the remainder of the fee. In the absence of an express contract between the broker and carrier, the Johnson court implied that a joint venture existed between the broker and the carrier because the entities had undertaken "a particular project, for mutual benefit and profit" (Id. at 241-42).

One of Riley's expert witnesses, Thomas Corsi, Ph.D., opined that C.H. Robinson and A.K. Logistics were operating as a joint venture (Docs. 41.1 at 16-17; 47.11 at 10).[3] Specifically, in his report, Dr. Corsi opines that "C.H. Robinson and A.K. Logistics were involved in a joint venture partnership with both parties equally responsible for the delivery of the goods

---

[3] As discussed more fully below, C.H. Robinson has moved to exclude Dr. Corsi's

transported in a safe and efficient manner as required by FMCSA regulations" (Doc. 47.11 at

10). Dr. Corsi further notes, as follows:

> It is the standard practice for C.H. Robinson and the customer to agree on a price for a particular shipment. Subsequently, C.H. Robinson contacts a carrier (in this case A.K. Logistics) to provide the transportation portion of the trip for a fixed price, below the price agreed to by the customer and C.H. Robinson. Thus, the customer's payment to C.H. Robinson for the shipment is shared between C.H. Robinson and the carrier (in this case A.K. Logistics) it selects to provide the transportation services. The relationship between C.H. Robinson and A.K. Logistics can best be characterized as a joint venture since both parties share in the profits for the services provided.

(Id. at 10-11).

> During his deposition, Dr. Corsi testified regarding his joint-venture opinion, as follows:

> So the first point I make in my report is that, in my opinion, there's a joint venture partnership between C.H. Robinson and A.K. Logistics. In the process of C.H. Robinson's business model, they make an agreement with a shipper for a fixed amount of payment for transportation services between point of pickup and point of delivery.

> Then subsequent to that action, they obtained the services of a motor carrier to provide transportation. And the margin that C.H. Robinson obtains from that activity is the difference between what they get from the shipper and what they pay to the carrier.

> And then, in my opinion, as a joint venture, both are benefitting. Both the C.H. Robinson and A.K. Logistics in this particular case are involved in a joint-venture partnership, and by definition, there's mutual benefit to both parties.

(Doc. 41.1 at 5). When asked to identify the standard he applied in forming his opinion, Dr.

Corsi testified that a "joint venture is a situation where the parties are mutually benefiting. So

both C.H. Robinson and A.K. Logistics mutually benefit from [their] agreement with the shipper

to deliver [the load]. . . . Joint venture, in [Dr. Corsi's] opinion, is when two parties mutually

benefit and profit from their activities" (Doc. 41.1 at 16-17).

---

opinions for a variety of reasons.

In reply, C.H. Robinson asserts that <u>Johnson</u> is factually distinguishable because, in that case, the broker and carrier agreed only informally as to the nature of their relationship, the carrier lacked operating authority, an employee of the broker rode in the carrier's truck during the delivery, the parties agreed to share profits from the delivery with others, and the parties declined to prepare a written agreement to memorialize their relationship, leaving the <u>Johnson</u> court to imply a joint venture (Doc. 64 at 15-17). It further argues that, under Missouri law, the terms of its written agreement with A.K. Logistics are controlling on the issue of whether the companies were engaged in a joint venture (<u>Id.</u> at 17-18).

3. Analysis

The Court concludes that the undisputed facts in this case establish, as a matter of law, that C.H. Robinson and A.K. Logistics were not engaged in a joint venture. <u>See</u> <u>Peterson</u>, 754 F.3d at 598 (summary judgment is appropriate where the undisputed material facts establish that the movant is entitled to judgment as a matter of law). First, the Court concludes that there is no evidence in the record of an express or implied agreement between C.H. Robinson and A.K. Logistics to form a joint venture. <u>See</u> <u>Barfield</u>, 2013 WL 12145822, at *2. To the contrary, the Agreement expressly provides that A.K. Logistics was an independent contractor and disclaims the existence or formation of a joint-venture relationship. <u>See</u> <u>Ritter</u>, 987 S.W.2d at 377; <u>Rosenfield</u>, 895 S.W.2d at 135; <u>see also</u> <u>Binkley</u>, 10 S.W.3d at 170; <u>cf.</u> <u>Johnson</u>, 662 S.W.2d at 241-42 (implying joint venture in absence of express agreement to the contrary). Unlike the agency issue, in the Court's joint-venture analysis, the terms of the Agreement disavowing the creation of a joint-venture relationship are entitled to significant weight. <u>See</u> <u>Jeff-Cole</u>, 454 S.W.2d at 16 ("The existence of a different type of express contract is in itself inconsistent with a claimed relationship of a joint venture by implication."); <u>see also</u> <u>Binkley</u>, 10 S.W.3d at 170-173

(declining to imply a joint venture or partnership where the evidence demonstrated only the existence of a contract for services, which contained "clear disclaimers" of a joint venture or partnership relationship). The Court notes that the Agreement clearly disavowed any joint-venture relationship, and that there is no other evidence in the record tending to show that C.H. Robinson and A.K. Logistics intended to create a joint venture. See Barfield, 2013 WL 12145822, at *2 (citing Ritter, 987 S.W.2d at 387) ("[T]he parties must intend to create a joint venture.")

Second, although C.H. Robinson and A.K. Logistics had a common interest in profiting from their relationship, they did not share profits or control over the enterprise. See Thompson, 183 S.W.3d at 617 (sharing of profits is an indication of a joint venture). Instead the benefit to A.K. Logistics was derived from separate, third-party agreements between C.H. Robinson and its customers. Specifically, for each delivery, C.H. Robinson would negotiate a price with its customer for the delivery of the customer's freight. A.K. Logistics would then quote C.H. Robinson a price to actually deliver the customers' freight. The hiring of A.K. Logistics was then entirely dependent on the third-party contract and the competitiveness of its price compared to other competing carriers. Only if A.K. Logistics' quoted price resulted in a profit to C.H. Robinson under the third-party contract would C.H. Robinson hire A.K. Logistics, versus a different carrier who offered a more competitive price. Notably, A.K. Logistics was not involved in, and had no control over, the price C.H. Robinson negotiated with its customers. See Ritter, 987 S.W.2d at 388 ("Merely sharing an economic interest is not sufficient to form a joint venture. There must be some evidence of the parties participating and having control over the enterprise."); see also Thompson, 183 S.W.3d at 617 (all parties having joint and several control

over the enterprise is an indication of joint venture). Here, A.K. Logistics had no control over C.H. Robinson's agreements with third-party customers.

Also, C.H. Robinson and A.K. Logistics did not share risks, losses, or control. Instead, the Agreement provided that A.K. Logistics would indemnify and hold C.H. Robinson and its customers harmless from and against all liabilities arising out of or in connection with the delivery services A.K. Logistics provided and called for each party to be liable for its own negligence. As previously discussed, the Agreement also authorized C.H. Robinson to withhold delivery payments from A.K. Logistics to satisfy other claims or shortages, prohibited A.K. Logistics from contacting customers for payment, and made A.K. Logistics liable to C.H. Robinson for losses and damages to shipments and delayed deliveries. As to individual loads, C.H. Robinson specified the equipment A.K. Logistics could use to deliver its customer's freight. A.K. Logistics was also required to make each delivery within a schedule set by C.H. Robinson and to obtain shipping instructions—including provisions for handling, securing, and protecting the freight—from C.H. Robinson. See Barfield, 2013 WL 12145822, at *2-3 (in a joint venture, members share a community of pecuniary interest in that purpose, and each member has an equal voice or an equal right in determining the direction of the enterprise). The Agreement does not reflect joint and several control of the enterprise between C.H. Robinson and A.K. Logistics.

The Court further notes that, even assuming its admissibility, Dr. Corsi's opinion is insufficient to create a genuine dispute on the issue of joint venture because it appears to be based on a misunderstanding of the elements of joint venture under Missouri law. Specifically, Dr. Corsi's deposition testimony reveals that his opinion is premised on the fact that C.H. Robinson and A.K. Logistics both benefited financially from the Agreement, without accounting for the absence of any agreement to share profits, losses, and risks, or any evidence that the

entities intended to enter into a joint venture. See Ritter, 987 S.W.2d at 388. Moreover, Dr. Corsi has also concluded that A.K. Logistics was C.H. Robinson's agent because C.H. Robinson exercised significant control over A.K. Logistics in relation to its delivery of the load, a conclusion that is inconsistent, at least in part, with his opinion that the entities were participating in a joint venture, which requires that each member have an equal voice or an equal right in determining the direction of the enterprise. See Barfield, 2013 WL 12145822, at *2.

Finally, the Court notes that Johnson is factually distinguishable from the instant case. Most notably, in Johnson, the defendants did not have a formal agreement explicitly disavowing the formation of a joint venture. 662 S.W.2d at 241 ("They did not put the details in writing but rather operated informally."). The Johnson defendants also agreed to share profits. Id. ("The parties undertook a particular project, for mutual benefit and profit."). Moreover, in Johnson, the carrier lacked operating authority, and an employee of the broker rode in the carrier's truck during the delivery. Id. at 240, 242. Unlike the defendants in Johnson, C.H. Robinson and A.K. Logistics entered into a written contract that expressly disavowed the formation of a joint venture, they had no agreement to share profits, A.K. Logistics had authority to operate as a motor carrier, and none of C.H. Robinson's employees rode in Yuldashev's truck while he delivered the load. Given the undisputed facts of this case, the Court declines to imply, under the reasoning of Johnson, the existence of a joint venture between C.H. Robinson and A.K. Logistics.

Therefore, considering the record as a whole and assuming the admissibility of Dr. Corsi's opinion, Riley has failed to create a genuine factual dispute as to his joint-venture theory, and C.H. Robinson is entitled to summary judgment to the extent Riley seeks to hold it liable based on the existence of a joint venture with A.K. Logistics. See Thompson, 183 S.W.3d at 617

(affirming grant of summary judgment on joint-venture theory where plaintiff adduced no evidence that defendants intended to form a joint venture, defendants did not share profits or losses, one defendant held title to the property while the other had physical control over it, and they did not exercise joint and several control).

### E. Conclusion

For the aforementioned reasons, the Court concludes that there remain genuine disputes of material fact regarding whether C.H. Robinson negligently hired A.K. Logistics and whether A.K. Logistics was its agent. The Court further concludes that the record evidence establishes, as a matter of law, that C.H. Robinson and A.K. Logistics were not engaged in a joint venture. Accordingly, the Court will deny C.H. Robinson's motion for summary judgment to the extent it seeks judgment in its favor on Riley's negligent-hiring and agency theories, and grant the motion to the extent it seeks entry of judgment in its favor on Riley's joint-venture theory.

## II. Daubert Motions

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Harrington v. Sunbeam Products, Inc., No. 4:07-CV-1957-CAS, 2009 WL 701994, at *1 (E.D. Mo., Mar. 13, 2009) (citing Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir.2001)). Rule 702 provides that an expert may testify if the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the witness has applied the principles and methods reliably to the facts of the case. US Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 691 (8th Cir. 2009). Pursuant to this rule, a district court acts as a gatekeeper "to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012) (quotation omitted).

A court is entitled to substantial discretion in determining whether expert testimony should be allowed. Id. "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." Id. at 456-57 (quotation omitted). When evaluating the sufficiency of expert testimony, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 544 (8th Cir. 2006) (quotation omitted). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir.1999), aff'd, 528 U.S. 440 (2000). The Rule "favors admissibility if the testimony will assist the trier of fact." Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir.1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted).

In Daubert, the Supreme Court explained that in examining an expert's opinions for admissibility, trial courts should consider the following criteria: (1) whether the theory being offered by the expert has been tested; (2) whether the theory has been subjected to peer review, publication, or analysis by others considered experts in the field; (3) whether the theory has a "known or potential rate of error"; and (4) whether the theory has been generally accepted by others in the field. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citing Daubert, 509 U.S. at 592). "'The exclusion of an expert's opinion is proper only if it is so fundamentally

unsupported that it can offer no assistance to the jury.'" <u>Sappington v. Skyjack, Inc.</u>, 512 F.3d 440, 448 (8th Cir. 2008) (quoting <u>Wood v. Minn. Mining & Mfg. Co.</u>, 112 F.3d 306, 309 (8th Cir. 1997)).

A.  Thomas Corsi, Ph.D.

Dr. Corsi is a professor of logistics and transportation at the University of Maryland, Robert H. Smith School of Business, and has held that position since 1976. Since 1980, he has also served as a consultant for the FMSCA, or a predecessor agency thereof, working on projects involving the evaluation and rating of motor carrier safety. Notably, he has served as a consultant in the development of algorithms that have since been incorporated into the current FMCSA motor carrier safety performance rating system. As relevant, Dr. Corsi has offered the following opinions:

(1) C.H. Robinson violated a standard of care for brokers.

(2) The standard of care for freight brokers requires that—for each carrier with which it works—the broker confirm the carrier's operating authority, obtain its insurance certificate, review its safety rating, and regularly collect and review available safety performance information on the carrier.

(3) C.H. Robinson and A.K. Logistics had a "joint venture relationship."

(4) C.H. Robinson exercised "significant control" over A.K. Logistics.

(5) C.H. Robinson was a motor carrier at the time of this accident.

(6) Robinson acted as a motor carrier at the time of this collision.

(Docs. 41.1; 47.11).

As an initial matter, C.H. Robinson argues that, although Dr. Corsi has been a university professor of logistics, supply chain management, and transportation for forty years, he is not qualified to offer any opinion in this case because he lacks any direct experience in the freight broker industry (Doc. 41 at 12-14). The Court concludes that Dr. Corsi's extensive experience in

academia and as a consultant qualifies him as an expert in the subjects of logistics, supply chain management, and transportation. See Fed. R. Evid. 702 (witness may be qualified as expert based on knowledge, skill, experience, training, or education); see also Jones v. C.H. Robinson Worldwide, Inc., 558 F. Supp. 2d 630, 653-54 (W.D. Va. 2008) (denying C.H. Robinson's motion to exclude Dr. Corsi's expert testimony based on his lack of practical experience in the freight broker industry).

C.H. Robinson also seeks to exclude Dr. Corsi's opinions for the following reasons. First, C.H. Robinson objects to Dr. Corsi's proposed standard of care, arguing that it is a "variable, non-standard." (Doc. 41 at 4-5). More specifically, C.H. Robinson contends that, because the standard requires brokers to regularly collect and review available safety performance information for each broker with which it works, the action required of a broker under the standard could vary from "from carrier to carrier, day to day and load to load." (Id.). C.H. Robinson also seeks to exclude the opinion on the basis that it is not supported by any statute, regulation, trade association, or published literature, but is instead a standard Dr. Corsi created (Id. at 5). Moreover, it argues that Dr. Corsi's standard of care should be excluded to the extent it purports to require review of BASIC scores because they are unreliable (Id. at 5-7).

In Missouri, evidence of industry customs or standards is generally admissible in negligence cases as proof on the issue of whether a defendant breached a duty of care. See Pierce v. Platte-Clay Electric Coop., Inc., 769 S.W.2d 769, 772 (Mo. 1989) (citing Kungle v. Austin, 380 S.W.2d 354, 361 (Mo. 1964)). As such, the Court will allow Dr. Corsi to offer his opinion relating to the standard of care for motor carrier safety in the freight broker industry. He cannot, however, offer purely legal conclusions or offer opinions that will otherwise invade the province of the jury. See In re Genetically Modified Rice Litig., No. 4:06-MD-1811-CDP, 2010 WL

5070718, at *6 (E.D. Mo. Dec. 6, 2010) (experts may not draw legal conclusions or interpret laws or regulations). For example, he will be allowed to testify that, as a broker, C.H. Robinson had a duty of care and what that duty would have entailed. The Court notes that C.H. Robinson may inquire, on cross-examination, as to the reliability of BASIC scores and the extent to which it may have been reasonable for a freight broker to disregard or give little weight to those scores when hiring carriers. Ultimately, C.H. Robinson's objections go to the weight Dr. Corsi's opinion should be given, not whether it is admissible; and it is for the jury to determine whether to agree with Dr. Corsi's proposed standard of care. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence.")

Second, C.H. Robinson seeks exclusion of Dr. Corsi's opinion regarding a "joint venture relationship," arguing, inter alia, that it is a purely legal conclusion that invades the province of the jury (Doc. 41 at 7-8). The Court will exclude this opinion, as it has been mooted by the Court's grant of summary judgment on Riley's joint-venture theory. See Fed. R. Evid. 402 (only relevant evidence is admissible); see also Fed. R. Evid. 401 (evidence is relevant if, inter alia, it is of consequence in determining the action).

As to Dr. Corsi's opinion regarding the extent to which C.H. Robinson exercised control over A.K. Logistics, C.H. Robinson argues that a jury will be equally capable of reviewing the documents on which Dr. Corsi has based his opinion and that the opinion thus will not assist the jury in understanding the evidence on this issue. C.H. Robinson further contends that Dr. Corsi's opinion relating to control should be excluded because it essentially tells the jury what conclusion to reach on the issue of the nature of the relationship between C.H. Robinson and A.K. Logistics (Doc. 41 at 8-10). The Court concludes that Dr. Corsi's opinion will assist the

jury in determining which facts are indicative of C.H. Robinson controlling or having the right to control A.K. Logistics in relation to its delivery of the load. As such, the Court will permit Dr. Corsi to offer opinions as to what evidence he believes is indicative of C.H. Robinson's right to control, and as to whether and to what extent C.H. Robinson actually controlled, or had a right to control, A.K. Logistics. If the parties have any doubt regarding whether a line of questioning will improperly invade the province of the jury, they shall raise the issue with the Court at the final pre-trial conference as part of a motion in limine, or consult with the Court at sidebar.

C.H. Robinson also seeks to exclude Dr. Corsi's opinions that it was a motor carrier or was acting as a motor carrier at the time of the collision (Id. at 10-12). The Court will reserve ruling on the admissibility of these opinions, subject to argument by the parties at the final pre-trial conference regarding the opinions' continued relevance given the Court's grant of summary judgment on Riley's joint-venture theory. The Court will thus grant in part and deny in part C.H. Robinson's motion to exclude Dr. Corsi's opinions.

B.  William Hampton

Since 1991, Mr. Hampton has been the president of W.E. Hampton and Associates, Inc. and has provided consulting and expert testimony on motor vehicle accident reconstruction, motor carrier safety and performance, and motor carrier compliance with federal and state regulations. He has been certified as a Motor Vehicle Accident Reconstructionist through the Missouri State Highway Patrol and the Institute of Police Technology and Management. He has testified as an expert witness in civil and criminal cases in various state and federal courts and as a police officer and a private investigator. His background includes thirteen years of service for the Missouri State Highway Patrol as a patrol officer investigating motor vehicle accidents and providing accident reconstruction. He also worked for several years at Champion Distribution

Services, a nationwide motor carrier, as the Director of Safety & Maintenance. <u>See</u> <u>Jones v.</u> <u>Beelman Truck Co.</u>, No. 4:13-cv-00252-CAS, 2015 WL 3620651, at *3 (E.D. Mo. June 9, 2015).

Mr. Hampton has offered the following opinions:

(1) Yuldashev's unsafe driving caused the collision by failing to maintain a proper lookout, making an unsafe lane change, and following another vehicle too closely allowing him to crash into Riley.

(2) A.K. Logistics and its drivers had a history of driving unsafely.

(3) A.K. Logistics failed to maintain a proper and safe Hours of Service program.

(4) A.K. Logistics failed to properly train its drivers on the safe operation of commercial motor vehicles, and to prevent motor vehicle crashes.

(5) C.H. Robinson had an opportunity to see that A.K. Logistics had a history of Unsafe Driving and Hours of Service violations, but had procedures in place to ignore much of the safety information of motor carriers it chose to do business with.

(6) The third-party non-defendants who contracted with C.H. Robinson for delivery of the freight involved in this crash identified as C.H. Robinson as the motor carrier.

(7) C.H. Robinson acted as a motor carrier.

(Docs. 43.1 at 13; 43.2 at 2-4). C.H. Robinson seeks to exclude Mr. Hampton's aforementioned opinions (Doc. 43). Specifically, C.H. Robinson argues that Mr. Hampton's first four opinions are impermissible legal conclusions that will invade the province of the jury, and that they are not based on any specialized knowledge (<u>Id.</u> at 4-6). C.H. Robinson further contends that opinions five and six are not in the nature of an opinion and will also invade the province of the jury (<u>Id.</u> at 6-7). Finally, C.H. Robinson seeks to exclude Mr. Hampton's seventh opinion because it was not included in his report as required by Federal Rule of Civil Procedure 37(c)(1) (<u>Id.</u> at 7).

The Court concludes that subject to a proper foundation, Mr. Hampton's first, second, third, fourth, and fifth opinions all fall within the scope of his expertise, are generally proper for expert testimony, and will be allowed. The Court will exclude Mr. Hampton's sixth opinion because it will not assist the jury, as it simply restates facts that are in evidence and thus is not in the nature of an opinion. Finally, the Court will reserve ruling on the admissibility of Mr. Hampton's seventh opinion, subject to the parties' arguments at the final pre-trial conference, as to its relevance to any remaining issue, in light of the Court's grant of summary judgment of the issue of joint venture. Therefore, the Court will grant in part and deny in part C.H. Robinson's motion to exclude Mr. Hampton's opinions.

C. Thomas Lambert

Thomas Lambert is the Wall Family Chair in Corporate Law at the University of Missouri School of Law; he teaches courses in contracts, business organizations, publicly held corporations, and anti-trust law (Doc. 85.1 at 1-2). He does not have any experience in the areas of trucking, trucking operations, or brokerage operations (Doc. 85 at 2). Professor Lambert has offered the following opinions:

> (1) C.H. Robinson and A.K. Logistics were not in the relationship of master and servant at the time of the collision.
>
> (2) C.H. Robinson and A.K. Logistics were not parties to a joint venture at the time of the accident.

(Doc. 85.1 at 2-14). Riley argues that Professor Lambert's opinions should be excluded because they are purely legal conclusions that tell the jury what result to reach in this case (Doc. 85). Riley also asserts that Professor Lambert misunderstands Missouri joint-venture law. (Id. at 5). In response, C.H. Robinson contends that Professor Lambert's testimony is necessary to rebut Dr. Corsi's opinions on the issues of agency and joint venture (Doc. 101). The Court

acknowledges Professor Lambert's expertise in business law and the laws relating to business relationships. Nevertheless, it is undisputed that he has no background in the industry that is at issue in this case. At this time, it appears to the Court that Professor Lambert's opinions are entirely legal conclusions that would invade the province of the jury. Subject to an offer of proof at the final pre-trial conference, the Court will exclude his opinions. The Court further notes that Dr. Lambert's opinion as to joint venture has been mooted by the Court's grant of summary judgment on Riley's joint-venture theory. See Fed. R. Evid. 402.

III. C.H. Robinson's Motion to Dismiss A.K. Logistics and Yuldashev

Riley has entered into a Covenant Not to Execute under Mo. Rev. Stat. § 537.065 ("Covenant") with Yuldashev, A.K. Logistics, and their insurer (Doc. 86.1 at 3-4). The Covenant provides that A.K. Logistics, Yuldashev, and their insurer are to pay Riley $999,000. (Id. at 3). In exchange, Riley has agreed "not to execute or collect on any assets of Defendants [A.K. Logistics], Yuldashev and/or [the insurer], should a judgment be rendered against any defendant" in this case (Id.). Moreover, the Covenant states that Riley, Yuldashev, and A.K. Logistics intend that the Covenant act as a bar against any crossclaim for contribution that C.H. Robinson may file in accordance with Mo. Rev. Stat. § 537.060 (Id.). In the Covenant, Riley specifically preserves his rights and claims against C.H. Robinson, and does not discharge C.H. Robinson from this or any other case (Id.). Notably, the Covenant specifically provides that A.K. Logistics and Yuldashev "shall in good faith participate in the litigation of [this case] (including testimony by [A.K. Logistics' president]) until [this case] is concluded by way of jury verdict, judgment, and/or appeal, unless the parties to this agreement agree otherwise at a later date" (Id.).

C.H. Robinson now moves to dismiss A.K. Logistics and Yuldashev, under Federal Rule of Civil Procedure 12(b)(1) or 21, arguing that the Court no longer has subject matter jurisdiction

over them because the Covenant has mooted any and all justiciable controversies between them and Riley (Doc. 86). C.H. Robinson characterizes the Covenant as a "Mary Carter agreement,"[4] claiming that Yuldashev and A.K. Logistics no longer have any incentive to put on a real defense because their liability is fixed by the terms of the Covenant and cannot change regardless of the result in this case (Id. at 4). Also, C.H. Robinson relies on the fact that it was not made aware of the Covenant until nearly two months after it was executed as evidence that Riley, Yuldashev, and A.K. Logistics' interests are now aligned (Id.). As such, C.H. Robinson contends that it will be prejudiced should A.K. Logistics and Yuldashev be allowed to continue in this case (Id.).

Alternatively, C.H. Robinson asks for the following remedial measures at trial, should its co-defendants not be dismissed from the case:

- Disclosure of the settlement, the Covenant, and the terms of the Covenant to the jury, by permitting C.H. Robinson to introduce evidence thereof and using an appropriate jury instruction;

- Permitting C.H. Robinson to cross-examine Yuldashev and A.K. Logistics about the Covenant in order to impeach them for bias, should they testify;

- Assigning all peremptory strikes for the defense to C.H. Robinson "since Robinson is now the only defendant with anything actually at stake;

- Prohibiting Yuldashev and A.K. Logistics from making opening statements and closing arguments, or limiting the length of their opening statements and closing arguments, and permitting C.H. Robinson to make its opening statement and closing argument after Yuldashev and A.K. Logistics have made theirs; and

- Precluding Yuldashev and A.K. Logistics from offering evidence at trial.

---

[4] "A Mary Carter Agreement is an agreement which limits the agreeing defendant's liability to a specified amount and guarantees the plaintiff that he will receive at least that amount. Such agreements also provide both that the agreeing defendant will remain in the case without fully disclosing the agreement, and that if judgment for more than the specified amount is obtained against the nonsettling defendant, the money collected will be used first to offset the specified amount so that the settling defendant may wind up paying nothing." Hackman v. Dandamudi, 733 S.W.2d 452, 455 (Mo. Ct. App. 1986); see also Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla. App. Ct. 1967).

(Id. at 5).

Riley opposes the motion to dismiss, contending that the Covenant is authorized by Mo. Rev. Stat. § 537.065 (Doc. 100 at 4-7). He further argues that he still has justiciable claims against Yuldashev and A.K. Logistics because the Covenant has not resolved a key issue in the case, i.e., apportionment of fault between Yuldashev, A.K. Logistics, and C.H. Robinson pursuant to Missouri's comparative fault system (Id. at 6-8). Riley also opposes dismissal under Rule 21, as neither Yuldashev nor A.K. Logistics has been misjoined in this action and severance is unnecessary (Id. at 9-13). In addition, he asserts that the Covenant is not a "Mary Carter" agreement because it has been fully disclosed and will not be reduced or offset by any judgment against C.H. Robinson (Id. at 14). Riley opposes C.H. Robinson's requests for remedial measures at trial, noting that the proposed relief would hinder Yuldashev and C.H. Robinson's ability to put on good faith defenses at trial, as the Covenant requires (Id. at 15-16).

In reply, C.H. Robinson argues that the Covenant goes beyond what is contemplated by § 537.065 because it amounts to a complete settlement and release of Riley's claims against all of C.H. Robinson's co-defendants. As such, C.H. Robinson reiterates its argument that the Covenant has resolved all claims against Yuldashev and A.K. Logistics, and that the Court no longer has jurisdiction over those defendants (Id. at 4-6). C.H. Robinson further contends that, absent dismissal of its co-defendants, its requested remedial measures are necessary to prevent distortion of the adversarial process (Id. at 7-9).

The Court will deny C.H. Robinson's motion to dismiss its co-defendants from this case. Initially, the Court notes that Mo. Rev. Stat. § 537.065 authorizes a plaintiff to enter into a contract with his tort-feasor whereby, in consideration for payment of specified amount, the plaintiff agrees that in the event of a judgment against the tort-feasor, the plaintiff will not levy

execution. Moreover, Mo. Rev. Stat. § 537.060 expressly provides that when a § 537.065 agreement is given in good faith to one of two or more tort-feasors, the agreement does not discharge any other tort-feasors from liability for the same injury, unless the agreement so provides. The Covenant is thus authorized by Missouri law.

The real issue in this case is whether, and to what extent, each of the defendants is liable to Riley for the damages he has incurred as a result of the collision. Litigation continues against all three defendants, and Yuldashev's and A.K. Logistics' participation at trial will be ongoing and meaningful. They continue to have a stake in this case because Riley seeks judgment against them, and the Covenant requires them to put forth a good faith defense at trial. The Covenant merely limits the amount of damages Riley can recover from Yuldashev and A.K. Logistics to a specified amount to be paid from their insurance policy. There has been no liability determination, and neither Yuldashev nor A.K. Logistics has entered into a consent judgment. See Balling v. Bendickson, No. 4:12-CV-860 CAS, 2012 WL 3715810, at *2-4 (E.D. Mo. Aug. 27, 2012) (declining to find that defendant was a nominal party for purposes of determining the court's diversity jurisdiction over personal injury action where she was represented by competent counsel, the essence of her § 537.065 agreement with plaintiff was to limit recovery to a specified amount to be paid by her insurance company, there had been no determination as to her liability, and she had not entered into a consent decree). For these reasons, the Court concludes that it retains jurisdiction over Riley's claims against Yuldashev and A.K. Logistics.

The Court agrees that some remedial measures may be needed and will determine, at the final pre-trial conference, what specific remedial measures will be appropriate and necessary at trial. The motion will thus be granted in part and denied in part.

## Conclusion

In accordance with the rulings herein,

**IT IS HEREBY ORDERED** that Defendant C.H. Robinson's Motion for Summary Judgment (Doc. 35) and Renewed Motion for Summary Judgment (Doc. 88) are **GRANTED IN PART AND DENIED IN PART**. The Motions are **GRANTED** to the extent they seek summary judgment on Plaintiff Johnny Oscar Riley's claim against C.H. Robinson based on a joint-venture theory. The Motions are **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Defendant C.H. Robinson's Motion to Exclude the Opinion of Thomas Corsi, Ph.D. (Doc. 40) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant C.H. Robinson's Motion to Exclude the Opinions of William Hampton (Doc. 42) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** Plaintiff Johnny Oscar Riley's Motion to Exclude the Opinions of Thomas A. Lambert (Doc. 85) is **GRANTED** subject to an offer of proof at the final pre-trial conference.

**IT IS FINALLY ORDERED** that Defendant C.H. Robinson's Motion to Dismiss Defendants A.K. Logistics, Inc. and Sarvar Yuldashev Pursuant to Rules 12(b)(1) and 21 or, in the Alternative, Motion in Limine and for other Relief at Trial is **GRANTED IN PART AND DENIED IN PART**.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

Dated this 9th day of June, 2017.